# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

JAMALE EUGENE SMALL,

    Petitioner,

v.                                       Case No. 3:18-cv-571-TJC-JRK

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

    Respondents.

## ORDER

**I.    Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is challenging a state court (Duval County, Florida) judgment of conviction for tampering with a witness and burglary of an occupied dwelling. He is serving a twelve-year term of incarceration. Respondents have responded. See Doc. 5; Response.[1] Petitioner filed a notice advising that he did not wish to reply, and instead relies on his assertions and claims as stated in the Petition. See Doc. 7. This case is ripe for review.

---

[1] Attached to the Response are numerous exhibits. See Doc. 5-1 through Doc. 5-22. The Court cites to the exhibits as "Resp. Ex."

## II. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or

2

>argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear

3

> error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### III. **Petitioner's Claim and Analysis**

Petitioner raises one claim for relief. He argues that the trial court erred in denying his motion to suppress all evidence of the burglary victim's, Camille Price, pretrial identifications of Petitioner. Doc. 1-1 at 1. According to Petitioner, trial counsel, on behalf of Petitioner, sought to suppress this identification evidence because it was obtained through impermissibly suggestive means that caused "a substantial likelihood of irreparable misidentification." Id. Petitioner asserts that the trial court violated his constitutional rights when it allowed the state to present such evidence.

Petitioner's initial brief filed on direct appeal summarizes the relevant facts. See Resp. Ex. S. On the morning of April 23, 2015, Price was alone in her apartment when she noticed a small white SUV parked sideways in the parking lot in front of her home. Two men she had never seen before got out of the vehicle. The driver was wearing a bullet proof vest and was holding a handgun. The man with the gun approached Price's sliding glass door and began to hit the glass with the butt of the weapon. Price asked the men what they wanted,

4

to which they replied that they were looking for her safe. Eventually, the force from hitting the glass caused the door to "pop" open and the two men came inside and walked to the back of Price's apartment. Price ran outside and called for help. As she sought help, the two men left, got back into the SUV, and drove away, but Price managed to write down the license plate number before they left.

Price then called 911 and told the police what happened. Price learned that the SUV belonged to Jamale Small. This information prompted Price to conduct an independent internet search using the name, leading her to find a picture of Petitioner on the Florida Department of Corrections website. She recognized that Petitioner was one of the men who came into her home. Sometime later, Officer Blankenship showed Price a photo of Petitioner and Price positively identified the photo as the one of the burglars. Later, police presented a photo spread to Price and she again picked Petitioner's photo as one of the men who participated in the burglary. In a second photo spread, Price picked Gregory Wallace, Petitioner's brother, as the second individual who participated in the burglary. Petitioner was then arrested.

Following Petitioner's arrest, trial counsel, on behalf of Petitioner, moved to suppress Price's out-of-court identifications of Petitioner and any future in-court identification of Petitioner. Resp. Ex. A at 44-49. According to trial counsel, Price's identification of Petitioner resulted from officers' "unduly

5

suggestive procedures," and thus violated Petitioner's due process rights. Id. at 45. He argued that Officer Blankenship's first photo presentation to Price only consisted of a single photo of Petitioner, "which in essence deliberately focuses [on] [Petitioner] and is therefore impermissibly suggestive." Id. at 47. He also contended that the single-photo identification of Petitioner tainted the later multi-photo lineup because Price was already drawn to Petitioner's photograph. Id.

The trial court conducted an evidentiary hearing on the motion to suppress. Resp. Ex. E at 436-94. During the hearing, Price testified about the details of the burglary. Id. She stated it was daylight outside, about 10:30 a.m., when the suspects approached her sliding glass door. She got a clear view of both suspects as they were right in front of her. Id. at 442. Price testified that the first man was around twenty-years old, six feet, "had a low haircut, he had on a bulletproof vest, and he had a gun with a little round barrel. The second gentleman was maybe six feet and he had long dreads." Id. Price explained that once the individual with the gun popped the door open, the men walked inside directly in front of her. Id. at 443. According to Price, the men were inside her apartment for about four minutes and during that time, she got a good look at their faces. Id. at 444. She had a brief conversation with the men about a safe, during which she was watching their faces. Id. Price stated she ran outside to

6

get help and at that time, she saw the men leave in a vehicle and managed to write down the tag number. Id. at 444-45.

According to Price, she called the police who arrived and took her statement including the tag information. Id. at 445. While the police were at her apartment, Price said she heard the police radio call out an address for an individual named "Small." Id. at 445. Price stated that later that day, she called the jail twice to inquire about whether the burglars had been arrested. Id. at 446. During one of those calls, Price gave an officer her incident number and the officer then provided Price with the name "Jamale Small" and advised her that no one had yet been arrested. Id. at 446. Price then used Petitioner's full name to search the FDOC website and found Petitioner's photo. Id. at 446-47. Price testified that when she saw the photo, she was "100 percent" certain that it was the same man who broke into her apartment wearing a bullet proof vest and wielding a gun. Id. at 447-48. Price explained that four days later, on April 27, she met with Blankenship who showed Price the same FDOC photograph of Petitioner. Id. at 448. Price stated she again recognized Petitioner and was "100 percent" certain that he was one of the individuals who broke into her apartment. Id. at 449. Price signed the back of the photograph and wrote, "without a doubt this is the individual that entered my home." Id. at 450. On May 7, Price met with Blankenship a second time, during which Blankenship presented a photo spread to Price. According to Price, she picked a photo from

7

the spread, signed her name to the back of the photo, and was again "100 percent" certain that the photo she chose was the same person who broke into her house. Id. at 449-51. Price also testified that if, during her personal search on the FDOC's website, she did not recognize the photo for Jamale Small, she would have admitted that fact. Id. at 458. But she was "positive" that the person identified in the photo was the same individual who broke into her house. Id.

Blankenship also testified at the evidentiary hearing that he was the investigator assigned to the case and first contacted Price via phone. Id. at 461. Price described the suspects and provided a tag number for the car she saw the suspects driving. Id. Blankenship stated that the tag number was registered to Jamale Small. Id. at 462. Blankenship then had an in-person meeting with Price and during the meeting, Price willingly provided Blankenship with Petitioner's name and advised that she had identified him as a suspect through her own research. Id. In response, Blankenship showed Price the FDOC photo of Petitioner "just to confirm the identity of the person she had already identified." Id. According to Blankenship, Price identified Petitioner as the individual who came into her house with a gun, and she was certain about that identification. Id. He asserted that days later, the state attorney requested that Blankenship present a photo spread to Price. Id. at 463. Blankenship compiled a spread using a photo of Petitioner different than the FDOC photo that Price had seen before and included other photographs of similar individuals. Id. at

8

463-64. Price selected the photograph of Petitioner. Resp. Ex. L at 401. According to Blankenship, Price selected the photo on her own accord, and he did not make any suggestions during the process. Resp. Ex. E at 464. The trial court then heard argument from each party. Id. at 467-77. Notably, trial counsel argued that all identifications for which Price made should be suppressed because they resulted from state assistance.

Two days after the hearing, the trial court denied the motion to suppress. The trial court announced its ruling on the recorded, explaining that it considered the factors set forth in Neil v. Biggers, 409 U.S. 188 (1972), and State v. Dorsey, 5 So. 3d 702 (Fla. 2009), to make its determination.

> One, is opportunity of the witness to view the criminal at the time at the scene . . . . But the testimony was that she got a good look at him through a big glass window and came almost face to face and that she did have an opportunity and that -- and so she did have a clear, full opportunity. [T]he number two factor is the witness's . . . degree of attention. You know, it's hard to tell that the way the proof comes out did they really probe her and ask a series of questions and then that's all she can come up with. I didn't get that sense. The woman seemed sharp and articulate and bright and she seemed clear and precise there.
>
> I don't know that they asked her a lot of questions and that's all that she could come up with; that she did say those things. And one of the key things in my mind is that she is sharp and articulate and this all seemed to happen in a spontaneous fashion in my mind and she sees him, she -- you know, the police are called and the investigation proceeds very quickly and that she expressed clear and I guess -- and that she didn't

9

waiver or vacillate and that she seemed certain and resolved about that.

So she did have, I think, a high level of attention. And then the accuracy of the witness's prior description, that is another thing. That is what, I guess, I was really addressing.

I don't view it as materially inaccurate. It is just that her later description, obviously, gets more complete, and Mr. Simmons would argue that that comes from a view of the photographs. But it is not completely clear to me that that was because of photographs or just because of an opportunity to be questioned in greater detail and to have her complete memory probed.

The photographs are not real clear and distinct, frankly. They don't have a lot of real close detail concerning tattoos and so forth, so I'm not really overly persuaded by the idea that she got really more accurate later because of the photograph as opposed to her getting more accurate later because everybody had a chance just to calm down and spend more time with her. And so I don't see a material switch or change in the accuracy of the witness's description before and after the photographs. And the level of certainty demonstrated by the witness at all levels at all times in this seems to be very high.

And then the length of time is certainly not long. This was a short period of time. And that is the other thing too. It seems that the police I suppose you could say that when someone at the jail gave her the first name, that was not a good idea, but that wasn't a conscious deliberate act on the part of the detective investigating this thing and attempting to influence a witness. It came spontaneously and, frankly, from this victim's own action, so it seems a little ironic and overbearing and knit-picky to throw out a witness's identification when it stemmed largely from the

10

witness's spontaneous action. She was upset and she was determined to find out what happened, and then she followed a series of steps that led her to investigate. Basically she was doing this on her own and fairly quickly and fairly spontaneously found the defendant and then was certain as soon as she saw the photograph and has remained resolute there.

And so the police were responding to her rather than setting up something that was suggestive or that would cause that was going to shape her opinion, so I think she had her own opinions spontaneously generated and that the police were reactive to her rather than the other way around.

That is why when I look at all of these factors, I find it is not unnecessarily suggestive and that the suggestive issues here raised by the defense I think would be more likely raised a[s] to the weight of the testimony, and I just think it would be overbearing and almost ironic to exclude a victim's testimony when she was proceeding largely on her own to figure this out. And so it just seems in essence different from those that are suggestive

. . . .

That is why you certainly can make all of the points that you make, and I think that could be weighed, but I just feel like it would be wrong and overbearing to exclude it and not let them see this, and so that is my ruling on that.

And then I think the in-court issue would necessarily follow, as I'm not going to exclude the out-of-court identification, and then I think it would be inconsistent to exclude the in-court because I -- not necessarily maybe, but because now you'll be saying that she's seen the photographs and that she saw the photospread and that her -- now she is locked onto Mr. Small because of that, and I'm finding that she

witness's spontaneous action. She was upset and she was determined to find out what happened, and then she followed a series of steps that led her to investigate. Basically she was doing this on her own and fairly quickly and fairly spontaneously found the defendant and then was certain as soon as she saw the photograph and has remained resolute there.

And so the police were responding to her rather than setting up something that was suggestive or that would cause that was going to shape her opinion, so I think she had her own opinions spontaneously generated and that the police were reactive to her rather than the other way around.

That is why when I look at all of these factors, I find it is not unnecessarily suggestive and that the suggestive issues here raised by the defense I think would be more likely raised a[s] to the weight of the testimony, and I just think it would be overbearing and almost ironic to exclude a victim's testimony when she was proceeding largely on her own to figure this out. And so it just seems in essence different from those that are suggestive

. . . .

That is why you certainly can make all of the points that you make, and I think that could be weighed, but I just feel like it would be wrong and overbearing to exclude it and not let them see this, and so that is my ruling on that.

And then I think the in-court issue would necessarily follow, as I'm not going to exclude the out-of-court identification, and then I think it would be inconsistent to exclude the in-court because I -- not necessarily maybe, but because now you'll be saying that she's seen the photographs and that she saw the photospread and that her -- now she is locked onto Mr. Small because of that, and I'm finding that she

> identified him spontaneously from her own investigation and that she was definitely certain, and so I think there is enough evidence to find that at least the state should be allowed those in-court identifications because this is showing that there's an independent basis . . . .
>
> So that leads me to deny the motion to suppress and to emphasize that all of those things I think are more appropriately brought out at trial and argued to the weight of the evidence.

State v. Small, No. 16-2015-CF-4229 (Fla. 4th Cir. Ct.).[2]

As his first issue on direct appeal, Petitioner, with help from appellate counsel, challenged the trial court's denial of his motion to suppress Price's identification testimony. Resp. Ex. S. In its answer brief, the state argued that Price's identifications were not impermissibly suggestive. Resp. Ex. T. The First District Court of Appeal found no error in the trial court's ruling and per curiam affirmed Petitioner's judgment and convictions without a written opinion. Resp. Ex. V. Presumptively an adjudication on the merits, the First DCA's decision is entitled to deference under § 2254(d).

In applying such deference, the Court notes that the Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the

---

[2] After a thorough review of the Response Exhibits, the Court was unable to locate the transcript of the hearing in which the trial court announced its ruling on the motion to suppress. However, the Court obtained a copy of that transcript from Petitioner's state court docket and takes judicial notice of that record here.

12

witness to identify a particular person as the perpetrator of a crime." Perry v. New Hampshire, 565 U.S. 228, 232 (2012). An out-of-court identification is subject to exclusion if the identification procedure was unduly suggestive so that it created a substantial risk of misidentification. Biggers, 409 U.S. at 199. In determining whether an identification violates due process, a court undertakes a two-part analysis. "First, we must determine whether the original identification procedure was unduly suggestive . . . . If we conclude that the identification procedure was suggestive, we must then consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988) (citing Biggers, 409 U.S. at 199).

In Biggers, the Supreme Court identified five factors to be considered in determining whether the identification was reliable. They are: the witness's opportunity to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the description of the suspect, the level of certainty of the identification, and the length of time between the crime and the identification. See Biggers, 409 U.S. at 199. In Manson v. Brathwaite, 432 U.S. 98 (1977), the United States Supreme Court stated that absent "a very substantial likelihood of irreparable misidentification," the identification of a suspect by a witness is evidence for the jury to weigh. Id. at 116.

13

Under the totality of the circumstances, Price's identifications of Petitioner as one individual who broke into her home were reliable. Applying the five <u>Biggers</u> factors: (1) Price was an eyewitness to the offenders committing the crime, looked directly at their faces, and spoke to them; (2) Price's ability to describe the clothing, build, and gender supports her degree of attention; (3) Price also accurately remembered the license plate number, which was registered to Petitioner, who had the physical characteristics matching those Price first reported; (4) at all times, Price was "100 percent" certain that Petitioner was the same male who broke into her home, and she knew right away that the male she identified in the photographs was the same man she saw commit the offense, (5) Price made her initial spontaneous identification within hours of the incident, she made her second identification two days later, and she made her third identification a few weeks later.

In consideration of the foregoing, the Court finds that the state appellate court's summary adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state appellate court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. As such, this claim is due to be denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3. If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[3]

**DONE AND ORDERED** at Jacksonville, Florida, this 26th day of July, 2021.



TIMOTHY J. CORRIGAN
United States District Judge

---

[3] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

15

Jax-7

C: Jamale Eugene Small, #133546
Barbara Debelius, Esq.